## MAIER et al. v. BLOOM et al.

### (Circuit Court, D. New Jersey. May 25, 1899.)

1. PATENTS—ABANDONMENT OF INVENTION.

When a recent prior patent is cited by the patent office as an anticipation, the failure of the inventor to set up that he in fact made his invention before the application for such anticipating patent was filed, and his acceptance of a patent with claims narrowed to exclude the anticipated matter, is an abandonment thereof to the public; so that, in a suit upon his patent, he cannot thereafter claim a construction which would cover the matter abandoned.

2. SAME—COMBINATIONS.

A combination of old elements, to be patentable, must possess attributes distinct from those of its constituent elements. The old elements must so co-operate with each other as to produce a new and useful result. And a mere duplication of old elements, even if useful, does not produce a result different from what would be produced by the elements separately, except in quantity or degree.

3. SAME—BED BOTTOMS.

The Maier patent, No. 303,393, for a spring bed bottom, is void as to both its claims because of the inventor's abandonment of his real invention, and because the claims, as issued, cover a mere unpatentable aggregation.

This was a suit in equity by Franz J. Maier, Robert P. Stoll, and Thomas A. Stoll against Jacob C. Bloom and John F. Godley for alleged infringement of a patent for a spring bed bottom.

Francis C. Lowthorp, for complainants.

John Dane, Jr., for defendants.

GRAY, Circuit Judge. This bill is to restrain an infringement of United States letters patent No. 303,393, issued to Franz J. Maier, one of the complainants, August 12, 1884, for "spring bed bottom." The bill alleges an exclusive license by the complainant Maier to the other

complainants, Robert B. Stoll and Thomas A. Stoll, and contains the allegations usual in such cases.

The specifications and claims, forming part of the letters patent, are as follows:

"This invention relates to that class of bed bottoms composed of upright spiral springs and spiral connecting springs, which unite said upright springs, and form an upper elastic bearing surface; the object of the invention being to provide a more uniform surface in such bed bottoms, and to more perfectly equalize the strain on the upright springs, whereby the said bottom is rendered more serviceable and durable. In the bottoms of this class heretofore in use, of which I am aware, the upright springs have been connected by connecting springs irregularly arranged, so that the tendency of the said connecting springs has been to draw a large portion of the upright springs to one side, whereby the top spirals of the said upright springs have been drawn or tilted out of a horizontal plane, and the bottom has thus been rendered rough, and therefore unpleasant to rest upon. In my improved device these defects have been overcome. The invention consists in the arrangement and combination of parts, substantially as will be hereinafter set forth, and finally embodied in the claims.

"Referring to the drawings, in which similar letters of reference indicate like parts in each of the several figures, Fig. 1 is a plan view of my device or a portion thereof; Fig. 2, a plan, a modified form thereof; and Fig. 3, a side elevation, showing two upright springs connected by horizontal springs. Fig. 4, represents a top plan of a single helical spring, and illustrating on larger scale the manner of passage therethrough of the elastic connecting springs.

Fig. 1.

Fig. 2.

Fig 3

Fig 4

"In said drawings, a, a,, a, are upright springs, arranged at intervals throughout the bed bottom, A, and b, b, b, are horizontal coiled wires, capable of an elastic spring action under longitudinal tension, which connect and are intertwined, by two or more turns, with and around the end coils or rings of each of the upright springs, whereby the said upright springs are directly and firmly united to the longitudinal coiled wires without other or extraneous fastenings, and form a complete bottom, A. The connecting springs are arranged in two or more series, as shown, the springs of one series being parallel, running from side to side of the bottom in a direct line, or approximately so, and intertwined with each top spiral in its course, at opposite sides of said spiral, so that the strain will be equalized. The springs in the co-operating series are also parallel, approximately straight, run from side to side of the bed bottom, and engage with the same side top spirals at opposite sides, which opposite sides are not the ones before mentioned, as will be understood, but lie adjacent thereto, as shown, so that the strain on each of the top spirals is uniformly balanced from four or more different and opposite directions, and that depression on the bottom has no tendency to draw one top spiral to any extent out of a plane with those lying adjacent, whereby unpleasant results are occasioned by the tilting of said top spiral. The said connecting springs, b, may be arranged singly, as in Fig. 1, in pairs, as in Fig. 2, or doubled, as at c in Fig. 1. If I desire, I can dispense with the connecting wires of one side of the bed bottom, and connect the ends thus left free to slats or other devices, doing the same without departing from the spirit of my invention; but, when the springs are connected at both ends by the spiral wires, a bottom is formed of greater lightness, and is better adapted to be handled. I therefore prefer the first-described mode of construction.

"In claim 2, I use the word 'transverse' in its generic sense, including connecting wires running in either diagonal direction with respect to the longitudinal wires or at right angles thereto.

"I am aware that upright coiled springs and horizontal coiled wires have been used together in bed bottoms prior to my invention, so I do not, therefore, claim the combination of the two broadly; but, having thus described my invention, what I claim as new, and wish to secure by letters patent, is:

"(1) In a spring bed bottom, the vertical springs, a, the spirals of which gradually enlarge towards each end, in combination with single continuous coiled wires running in longitudinal, transverse, and diagonal directions over both surfaces of said upright springs, and connecting with the outer spirals thereof, whereby is formed on both sides a continuous elastic bearing surface, substantially as shown.

"(2) In a spring bed bottom, the combination of a series of spiral springs tapering in opposite directions from their centers, with continuous coiled wires connecting the outer spirals of said springs in longitudinal and transverse directions on the upper and lower faces thereof, substantially as described."

Concerning the structure shown and described in complainants' patent, and specified as new in the claims, complainants' expert witness, John C. Pennie, testifies as follows, on pages 18 and 19 of the record:

"The invention, as thus particularly pointed out in claim 1, quoted, requires for its embodiment, as I understand it, that upon both sides of the bed bottom a continuous elastic bearing surface should be formed by single, continuous, coiled wires, which run in longitudinal directions over both surfaces, and vertical springs, which gradually enlarge towards each end, and that such coiled wires should connect with the outer spirals of the vertical springs. Such a construction necessarily involves, as I view it, the uniform distribution, substantially, of convolutions of the connecting coiled wires about the entire periphery of the upper and lower convolutions of the vertical springs, thereby producing a bed-bottom surface of substantially uniform sustaining power throughout. The construction or thing particularly pointed out in this claim (the second) differs in scope from that particularly pointed out in claim 1. In order to make this clearly apparent, the following paragraph, appearing in the body of the specification, should have consideration: 'In claim 2, I use the word "transverse" in its generic sense, including connecting wires running in either diagonal direction with respect to the longitudinal wires or at right angles thereto.'

It is apparent, therefore, that the patentee had in mind, as one of the forms of bed bottom embodying his invention, not only one wherein the transverse wires were arranged diagonally to the longitudinal wires, but also one wherein the transverse wires were at right angles to the longitudinal wires. Such a construction being within the contemplation of the patentee, and being expressly referred to in the body of the specification, as coming within the invention defined in claim 2 of the patent in suit, it is clear that the invention defined in said claim 2 would be embodied in a construction wherein series of spiral springs tapering in opposite directions from their centers are combined with continuous coiled wires, extending longitudinally of the bed bottom, and transversely with respect thereto, in a direction either at right angles to the longitudinal wires or diagonal with respect thereto, the several coiled wires connecting the outer spirals of the vertical springs on both the upper and lower faces thereof."

On cross-examination by defendants' counsel, the expert witness Pennie testifies as follows:

"As far as I am aware, it was broadly new at the date of complainants' patent to provide a bed bottom with a continuous elastic bearing surface made by intertwining with the terminal coils of vertical springs continuous coiled wires running in longitudinal, transverse, and diagonal directions, in such manner that the terminal coils of the vertical springs were enveloped by symmetrically spaced convolutions of said coiled wires. It was also broadly new with complainants, so far as I am aware, to provide an elastic surface intermediate of the springs, and filling the interspace between the terminal convolutions of the vertical springs by means of coiled wires connecting said convolutions in longitudinal and transverse directions, whether the transverse direction is diagonal or at right angles to the longitudinal wires. If either of these features is in the prior state of the art, I am not aware of it, nor have I been able to find it."

The defendants submit the following statement of the grounds of defense:

"(1) Because the patent to Maier is for nothing but an aggregation of parts taken from the old art in spring beds, and arranged in the same, and in substantially the same, way as previously arranged, with no operation or result arising therefrom different from operations and results obtained by the combination of like parts in spring beds of dates prior to complainant's patent; and (2) because the construction of the spring bed patented by Maier, in view of the prior art, did not involve invention, and is therefore void; and (3) because defendants' spring bed is further from the Maier structure than the latter is from the old patented beds described and shown in the Bulkeley and Faith patents; and (4) because the claims of the Maier patent are not infringed by defendants, when construed in the light of the prior art, and the express terms thereof, by which they must be limited; and (5) because there is no competent evidence to show that the spring bed said to have been procured from Mrs. Cornew was either made or sold by defendants; and (6) because the proofs in the case are clearly against the validity of the Maier patent, which stand uncontradicted; and (7) because the patented structure of Maier was not a patentable combination of parts at the date of its issue, but only an aggregation of old elements, taken from various old patented spring beds, performing no new function, no new operation, no new result; neither do either of the several parts of the combination act any differently, by reason of their arrangement in which thy are found in the Maier patented bed, from what they performed in combinations of the same and similar parts present in older patented combinations in spring beds; neither do the parts constituting the Maier patented bed coact in the combinations of that patent any differently from what they did in similar spring beds, of dates long prior to complainant's supposed invention."

These defenses may be summarized under two general heads: (1) A denial of the validity of the patent issued to complainant, on the ground of want of novelty and lack of invention; and, (2) admitting the validity of the patent, a denial of infringement.

As to the first general defense, a careful examination of the testimony and exhibits discloses the following as sufficiently established facts:

That the complainant Maier filed his application for a patent, February 15, 1883, which was rejected by the examiner on the patent to Bulkeley of August 8, 1882, No. 362,366. That on March 6, 1883, March 17, 1883, March 27, 1883, and August 31, 1883, rejections of amended claims were made on the ground of anticipation by other patents, principally, if not altogether, on those of Bulkeley, above referred to; of Mallette, of November 11, 1879, No. 221,586; of Demeure & Mauritz, of September 13, 1853, No. 10,010; of Bushnell, reissue of August 23, 1870; and of Judson, of January 10, 1871, No. 110,854. The specifications forming part of the several letters patent, and the accompanying drawings and exhibits are printed in the record.

Owing to the several rejections of the original and amended claims by the examiner of patents, above referred to, the original claim of Maier was much narrowed in the two claims finally allowed in March, 1884, the original application having been filed, as already stated, February 15, 1883. The two claims thus allowed, and already recited in the specifications, may again be stated:

"(1) In a spring bed bottom, the vertical springs, a, the spirals of which gradually enlarge towards each end, in combination with single continuous coiled wires running in longitudinal, transverse, and diagonal directions over both surfaces of said upright springs, and connecting with the outer spirals thereof, whereby is formed on both sides a continuous elastic bearing surface, substantially as shown.

"(2) In a spring bed bottom, the combination of a series of spiral springs tapering in opposite directions from their centers, with continuous coiled wires connecting the outer spirals of said springs in longitudinal and transverse directions on the upper and lower faces thereof, substantially as described."

It is also sufficiently established by the testimony in the cause that Mr. Maier had constructed, as far back as January, 1879, a bed bottom embodying, substantially, in principle and in construction, the features claimed for his patented bed bottom as issued in 1884. This one completed bed bottom, made in 1879, was constructed by him in his own house, used by his wife and children, and finally deposited in the cellar of his house, where it appears to have remained until produced as an exhibit in this cause. An inspection of this bed bottom will sustain his claim to priority over the Bulkeley patent, as it exhibits precisely the peculiarities of structure afterwards claimed by Maier in his various claims rejected and allowed by the examiner of patents. We have here the double helical springs, with the longitudinal and diagonal coiled wires interlacing with the upper convolutions of the vertical springs, performing the same functions of sustaining the helical springs, and exhibiting an elastic bearing surface on both sides, dispensing with the slats or frame of any kind, being self-supporting throughout. If the use of the coiled wire running in longitudinal and diagonal directions, and interlacing, as described, in the upper rings of the vertical springs, was a product of the inventive faculty, and not a mere clever mechanical device for the support of the upright springs and the creation of a more elastic bearing surface, then

I am of opinion that the Maier bed bottom of 1879 was both new and useful, and entitled to protection of the patent laws.

I do not find that any of the devices referred to for supporting the helical springs, though numerous and patented, anticipate the principle, or rather the peculiar features, of this construction. The structure patented by Bulkeley, in 1882, though anticipating Maier's patent, was several years subsequent, so far as the proofs go, to the making of this structure by Maier. Claiming, as he did, that this device was patentable, no explanation is given by Maier of why, in this interval of four years, no application was made for a patent, or steps taken towards applying for one. There is no evidence to show that it had been in public use or on sale during this period, or at any time after its construction, in 1879. The secret, so far as it was a secret, was confined to himself and his family. Undoubtedly, it was laches to have delayed so long his application, and laches which might have been considered by the examiner in passing upon the case, had it been presented to him, as no reasonable excuse has been suggested to account for the procrastination. This production of the bed bottom of 1879 not being in the case before the examiner, left the application made by Maier in 1883 (which was finally granted on the modified claims in February, 1884) in such a situation that the examiner was justified in considering the Bulkeley patent of 1882 as an anticipation of Maier's claim for an invention, as stated by him.

The final allowance of the modified claims by the examiner seems to have been on the ground that the claim was confined to a structure presenting two elastic bearing surfaces, exactly similar, and the claim for the interlacing of the coiled wires and the vertical springs was rejected. This is only presumably so, as the examiner has stated no grounds for the final allowance of claims which do not, as they read, seem very different from those originally made.

If it were necessary in this case, it might seriously be considered whether Maier's device of the coiled wires, longitudinally and transversely interlacing with the upright springs, was patentable, on the ground that it was, however ingenious, useful, and novel, not the result of invention. Such an inquiry might well be directed to some other devices to the same end which have been the subject of patents. But this inquiry is not necessary in the present case, because it is admitted that Maier's claim as finally allowed, and for which the patent in question was issued, is much narrower. On page 9 of complainants' supplemental brief, it is stated that the second claim of Maier's patent is the one upon which the present suit is based. On page 13 of the same brief it is said:

"Maier is shown to be the first original and sole inventor of them [that is, the interlacing of coiled wires with helical springs], and although, by reason of his acceptance of those claims [meaning the two claims allowed by the examiner and accompanying his patent], he must be held to have dedicated to the public bed bottom embodying only one bearing surface of his invention, he is, under all the decisions of the courts, entitled to a monopoly in the structure having two such bearing surfaces, by the combination of elements shown, described, and claimed in the patent."

This is practically an admission of the acquiescence by Maier in the rejection by the examiner of his claim to the invention of the combina-

tion of coiled wire interlacing with the upper convolutions of the helical springs, for the support of said springs, and the making of a firmer and more elastic bearing surface, and of the confining of his claim to the production of a bed bottom with two such surfaces, top and bottom alike. It is true that complainants' counsel contends, with ability and ingenuity, that inasmuch as it is now shown, what was not shown to the examiner, that Maier, in January, 1879, and prior thereto, had invented the device of interlacing continuous strands of coiled wire longitudinally and transversely with the helical springs, he is entitled to be considered by the court as the original inventor, and to a monopoly under his patent to the same, when such device appears on both surfaces of a bed bottom, his claim being confined to such a structure. It is this unitary structure, as the result of the combination of the two surfaces thus produced, for which patentability is claimed. It is admitted that Maier, in accepting the modified claim, "dedicated" to the public bed bottoms embodying only one bearing surface of his invention. Is not this a practical abandonment of the claim to a surface so produced? Can the patent now in question be for anything else than for a combination of two such nonpatentable elements? Clearly not, unless the court can enlarge the scope of the patent, by declaring—First, that Maier originally discovered this peculiar feature of coiled wire, interlaced with helical springs, in or prior to January, 1879, and has not forfeited his right thereto; and, second, that, therefore, under the claim of his patent, though narrowed, he is entitled to protection whenever this feature appears on both surfaces of a bed bottom alike.

If the first proposition is established, the second follows, of course, as one may, in asking for a patent, claim less than he is entitled to. But as to the first, waiving any inquiry as to the patentability of the device of interlacing coiled wire with helical springs, as claimed by Maier, it does not appear that any explanation or excuse has ever been given, as I have already said, for the long delay of more than four years that elapsed between the alleged invention and the application for a patent. The examiner seems to have been unaware that Maier claimed the idea, much less the completed structure, as being so old with him. He did not insist on the interference he asked for, and did nothing and said nothing to rebut the inference of an abandonment on his part, or relieve himself from the charge of laches.

I do not think that this court, upon the evidence in the case, should set up the claim thus repeatedly rejected by the patent office, and so neglected by the complainant. It is too late now for Maier to claim the invention of the elastic bed surface, composed of vertical helical springs, interlaced with coiled wire as stated.

If so, then the patent, if supported at all, must be so on the ground that the combination of two nonpatentable surfaces, thus constructed, is in itself patentable. In other words, it is said by complainant: "Though I invented the laced web-bearing surface thus constructed, I abandon or dedicate it to the public." It is therefore no longer a device patentable by Maier or by any one else, but he claims the invention of, and a patent for, a combination of two such surfaces, one on the upper and one on the lower side of a bed bottom. A combination

of old elements, patented or nonpatentable, may be the result of invention, and thus in itself patentable. But such a combination must possess attributes distinct from those of its constituent elements. In a patentable combination, the old elements must so co-operate with each other as to produce a new and useful result. A mere duplication of old elements may be useful, but it does not produce a result differing from what would be produced by the elements separately, except in quantity or degree. While this may be a useful result, it is not a new or patentable result. I do not mean that the result of such a combination in a machine or structure should, in all cases, be a result of the interaction of the co-operating elements in such fashion as to produce an entirely new result, that would have its analogue in the result of a chemical combination, but there must be some attribute or quality in the combination distinct from those of its elements, so as to distinguish the combination from a mere aggregation of parts.

In this combination of the two bearing surfaces, I cannot perceive that any new result has been obtained. The elasticity is the same, produced in the same manner by the coiled wire and springs, performing the same functions, as they do in a single surface. The only thing that can be predicated of the combination might be an increase of elasticity, but this is only a change in degree of a character that has been many times adjudged not patentable. The combination, as a whole, does not possess attributes distinct from those of its constituent elements. But this is not all. I cannot perceive that any exercise of the inventive faculty was necessary to duplicate on the bottom the laced web elastic surface on the top of the mattress. Granting, for the sake of argument, that there may have been a novel and useful invention in the production of the interlaced elastic bearing, composed of helical springs and coiled wires, as conceived by Maier, yet, that conception being excluded from the domain of patentability, the combination of two such bearing surfaces on the top and bottom of the mattress, however useful and convenient, or even novel, is, in my opinion, an obvious mechanical suggestion, which required no inventive faculty to produce.

Patentability, as claimed for this combination, should be denied on the grounds just stated. There is still another ground which negatives patentability of this combination. It is clearly shown by the testimony of the expert for the defendants and the exhibits in the record that metallic spring bed bottoms, with hourglass form of vertical springs, united at their end convolutions, top and bottom alike, so that they may be used either side up, had been patented and were in use prior, not only to the patent of Maier, but prior to the date at which he claims to have constructed the double bed bottom,—in 1879. A reference to specifications and drawings in the record will show this to be so, viz.: Patent to Bushnell, No. 9,658, April 12, 1853; reissue to Bushnell, 1869; reissue to Bushnell, 1870; reissue to Bushnell, 1871; Osborn and Kendrick, 1873; Andrews, 1872; Alvord, 1875; Rich, 1871; Boyington, 1876; Smith, 1882; R. H. Cutter, 1867.

If he cannot claim the combination of coiled wire with helical springs to make a bearing surface, as I have said before, it is hard to conceive how making the two surfaces alike would make the whole

structure patentable, in view of the fact that double metallic bed bottoms were well known before the invention of Maier. But it should not go without remark that the specifications accompanying the patent, as well as the claims themselves, evidently treat the duplication of surfaces as a mere incident to what is considered the real invention and the basic principle of the patent. The language of the claims already quoted sufficiently shows this, but it is made still more clear in the specifications, as in lines 8–28, which read:

"This invention relates to that class of bed bottoms composed of upright spiral springs and spiral connecting springs, which unite said upright springs and form an upper elastic bearing surface; the object of the invention being to provide a more uniform surface in such bed bottoms, and to more perfectly equalize the strain on the upright spring, whereby the said bottom is rendered more serviceable and durable. In the bottoms of this class heretofore in use, of which I am aware, the upright springs have been connected by connecting springs irregularly arranged, so that the tendency of the said connecting springs has been to draw a large portion of the upright springs to one side, whereby the top spirals of the said upright springs have been drawn or tilted out of a horizontal plane, and the bottom has thus been rendered rough, and therefore unpleasant to rest upon. In my improved device, these defects have been overcome."

Or in lines 80–89:

"If I desire, I can dispense with the connecting wires of one side of the bed bottom, and connect the ends thus left free to slats or other devices, doing the same without departing from the spirit of my invention; but, when the springs are connected at both ends by the spiral wires, a bottom is formed of greater lightness, and is better adapted to be handled. I therefore prefer the first-described mode of construction."

In view of such statements by the patentee, it can hardly be contended that his idea of his invention was confined to the exhibiting, on both sides of a bed bottom, the laced web elastic bearing surface, as described, the invention of which bearing surface by itself he had abandoned to the public, and that only and whenever two such surfaces appeared in combination, top and bottom, his rights under the patent would be infringed. If so, his rather anomalous position would be this: "It is true that I am the original inventor of this laced web-bearing surface, but I do not claim a patent for it, but abandon it to the public. So that any one can make such a bearing surface for the top of a bed bottom without infringing upon my patent right. If, however, you do on the bottom what you have done, and may lawfully do, on the top, I will enjoin you as an infringer." In fact, the concededly narrow claim, based on the two surfaces of the laced web device, seems to have been an afterthought, and, in my opinion, it cannot support the patent. For all the reasons stated, the bill must be dismissed.